IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHON DERRON BAILEY, | ) | CASE NO. 1:14CV913 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Stephon Derron Bailey ("Bailey") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

**I. Procedural History**

Bailey protectively filed an application for SSI on November 16, 2012, alleging a disability onset date of August 9, 1991. Tr. 9, 102, 113. He alleged disability based on the following: diabetes, depression, bi-polar, anger issues, and left eye vision problems. Tr. 117. After denials by the state agency initially (Tr. 75) and on reconsideration (Tr. 81), Bailey requested an administrative hearing. Tr. 84. A hearing was held before Administrative Law Judge ("ALJ") Traci M. Hixson on October 8, 2013. Tr. 23-46. In her January 10, 2014, decision (Tr. 9-17), the ALJ determined that there are jobs that exist in significant numbers in the

1

national economy that Bailey can perform, i.e., he is not disabled. Tr. 16. Bailey requested review of the ALJ's decision by the Appeals Council (Tr. 4) and, on March 21, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Bailey was born in 1991 and was 21 years old on the date his application was filed. Tr. 102. He has no past relevant work. Tr. 117.

### B. Medical Evidence

#### 1. Physical evidence

On May 16, 2012, Bailey underwent a corneal transplant on his left eye at the Cleveland Clinic as a result of being diagnosed with Keratoconus.[1] Tr. 190. On July 20, 2012, William J. Dupps, M.D., noted that Bailey's left eye rejected the corneal graft. Tr. 188. Dr. Dupps commented that Bailey's left eye showed slight improvement but that he still had significant edema. Tr. 188. Dr. Dupps opined that Bailey was not a good candidate for oral steroids because he had poorly controlled diabetes. Tr. 188. On August 16, 2012, Dr. Dupps observed that Bailey's graft rejection had settled but that he still had marked edema. Tr. 192.

On October 5, 2012, Bailey had another corneal transplant operation on his left eye. Tr. 204-206. Again, the transplant was rejected. Tr. 269. Dr. Dupps stated that Bailey's diabetes mellitus contributed to the rejection. Tr. 269. Dr. Dupps wrote, "[e]stablish control first, then schedule Penetrating keratoplasty Left eye with understanding of high risk nature and importance of compliance and coordinated care with PCP." Tr. 269-270.

---

[1] Keratoconus is defined as a noninflammatory, usually bilateral, protrusion of the cornea, the apex being displaced downward and nasally. The cause is unknown, but hereditary factors may play a role. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 980.

2

**2. Mental evidence**

On July 18, 2012, Bailey was admitted to the Windsor-Laurelwood Center for Behavioral Medicine for partial hospital care for mood stabilization.  Tr. 172.  The treatment record indicates that Bailey reported "benefiting from the trial of Abilify in terms of reduction of racing thoughts and symptoms of psychosis, although he admits to missing frequent doses of the medication secondary to having difficulty getting the prescription recently.  He reports a history of auditory hallucinations and distinct manic episodes if going off the medication for any extended amount of time."  Tr. 172.  On mental status examination, Michael Bell, M.D., observed that Bailey appeared disheveled and had an anxious mood, but that he was cooperative, his speech was normal, his thought process was goal-directed, his associations were intact, and his thought content was negative for suicide.  Tr. 172.  Bailey's attention and concentration were fair and he named 3 out of 3 objects in 5 minutes.  Tr. 172.  His remote and recent memory were both grossly intact, his language was clear, his intelligence was average, and his fund of knowledge, judgment, and insight were fair.  Tr. 172.  His motor activities and activities of daily living were within normal limits.  Tr. 172.  Dr. Bell diagnosed Bailey with bipolar disorder with psychotic features, diabetes, and obesity.  Tr. 173.  He restarted Bailey on Abilify and recommended increasing the dosage.  Tr. 173.  On July 27, 2012, Bailey's symptoms had improved and he was discharged in fair condition.  Tr. 171.

**C. Medical Opinion Evidence**

**1. Consultative Examiners**

<u>Mental</u>:  On February 26, 2013, Bailey saw consultative psychologist Mitchell Wax, Ph.D., for a psychological evaluation.  Tr. 243-248.  Bailey reported that he was unable to work because of his anger problems, social problems, and vision problems.  Tr. 243.  He also stated

that he was an insulin-dependent diabetic.  Tr. 244.  Dr. Wax commented that Bailey was morbidly obese.  Tr. 244.

Bailey reported that he gets only a few hours of sleep a night.  Tr. 244.  He stated that he does not cook because he cannot see well enough to use a microwave.  Tr. 244.  However, he also stated that he has a cell phone and uses "apps" on his phone.  Tr. 244.  He bathes daily, washes dishes every other day, cleans the bathroom once a week, and does laundry once a month.  Tr. 244.  He goes grocery shopping once a month with his mother, his girlfriend, or his girlfriend's mother.  Tr. 244.  He likes to listen to the radio and draw but he does not watch television.  Tr. 244.  He reported a good relationship with his grandmother, mother, girlfriend, and younger brother.  Tr. 244.

Upon examination, Dr. Wax observed that Bailey often squinted his eyes but that he was able to walk into the room on his own and had no trouble signing the examination form.  Tr. 245.  He made no eye contact and stared at the ground.  Tr. 245.  He was able to answer questions but spoke in a monotone voice and did not smile.  Tr. 245.  He appeared to be depressed, annoyed, and sad.  Tr. 245, 246.  Bailey reported daily crying spells and getting angry daily.  Tr. 246.  He did not appear anxious.  Tr. 246.  Dr. Wax commented that Bailey showed annoyance when Dr. Wax probed him with questions.  Tr. 246.

Bailey's speech was logical, coherent, and goal-directed.  Tr. 245.  Dr. Wax stated, "[a]t times he appeared to intentionally become vague and circumstantial, especially when asked about how he spends a typical day.  At these times he appeared to be malingering."  Tr. 245-246.  Dr. Wax opined that Bailey had an average range of intelligence.  Tr. 246.  He showed intermittent memory problems.  Tr. 246.  He was oriented to person, place, time, and situation, demonstrated no evidence of mental confusion, and his ability to concentrate was good.  Tr. 246.

He exhibited no delusional beliefs or hallucinations. Tr. 246.  His flow of conversation and thought was "choppy." Tr. 246.  Bailey could recall five numbers forward and three numbers backward, could recall two out of three words after five minutes, and was able to add by threes to forty and subtract sevens from one hundred.  Tr. 246.

Dr. Wax diagnosed Bailey with bipolar disorder in partial remission and intermittent explosive disorder. Tr. 247.  He opined that Bailey is able to understand, remember and carry out instructions based on his ability to take care of his girlfriend's one-year-old, perform household chores, his performance during the evaluation, and his estimated IQ level.  Tr. 248.  Dr. Wax found that Bailey is able to perform simple and multistep tasks.  Tr. 248.  He opined that Bailey would have difficulty responding appropriately to supervisors and coworkers in a work setting based on his reported history of difficulty getting along with others in school, his past domestic violence arrest, and his stated difficulty functioning outside the house when he is out by himself.  Tr. 248.  Dr. Wax also found that Bailey would not respond appropriately to work pressures in a work setting based on his past difficulty functioning in school.  Tr. 248.  Dr. Wax noted that Bailey had no work history and that it is unknown how he would respond in a work setting. Tr. 248.

<u>Physical</u>:  On October 31, 2013, Bailey saw consultative ophthalmologist Stuart Terman, M.D., for an ophthalmologic examination.  Tr. 249-260.  Dr. Terman found that Bailey's eyesight was 20/50 with his right eye and that he could see hand movements with his left eye. Tr. 250.  Dr. Terman remarked that Bailey can read large print using his right eye and was able to ambulate unassisted into the office.  Tr. 251.  He commented that Bailey needs visual assistance to see a bus number when he takes a city bus.  Tr. 251.  He opined that Bailey should avoid working at heights or in hazardous situations.  Tr. 251.

5

**2. State Agency Reviewers**

Mental: On March 7, 2013, Bruce Goldsmith, Ph.D., a state reviewing psychologist, reviewed Bailey's file. Tr. 51. Dr. Goldsmith opined that Bailey had moderate difficulties in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 56. Dr. Goldsmith found that Bailey should be limited to simple to moderately complex tasks that are not fast-paced or have unusual production demands. Tr. 56. He also found that Bailey was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to supervisors, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Tr. 56. He limited Bailey to occasional and superficial interpersonal contact. Tr. 56. Dr. Goldsmith found Bailey to be moderately limited in his ability to respond appropriately to changes in the work setting and that he should be limited to routine tasks with infrequent changes. Tr. 57.

On April 19, 2013, state agency psychologist Bonnie Katz, Ph.D., reviewed Bailey's file. Tr. 68. Dr. Katz opined that Bailey was capable of performing simple tasks (that he was motivated to perform) without strict time or fast-paced production demands, that he could make simple decisions, and that he could adapt to infrequent changes in routine that were fully explained. Tr. 69-70. She found that Bailey was capable of occasional, brief, and superficial interpersonal contact in a non-public setting. Tr. 69.

Physical: On January 30, 2013, Lynne Torello, M.D., a state reviewing physician, reviewed Bailey's file. Tr. 53-55. Dr. Torello found that Bailey had limited acuity, depth perception, and field of vision in his left eye. Tr. 54. She opined that Bailey could perform medium work but should avoid hazardous machinery, unprotected heights, and commercial

6

driving. Tr. 54. He should never climb ladders, ropes or scaffolds due to his poor vision. Tr. 53-55.

On April 19, 2013, reviewing physician Robert Klinger, M.D., reviewed Bailey's file and affirmed Dr. Torello's opinion. Tr. 66-68.

### D. Testimonial Evidence

#### 1. Bailey's Testimony

Bailey testified at the administrative hearing. Tr. 24-41. He was not represented by counsel. Tr. 24. He stated that he lives with his mother, brother and sister. Tr. 27, 30. He has a girlfriend who has a child and he used to live with them. Tr. 32. He graduated from high school. Tr. 28. He is able to prepare meals for himself such as sandwiches. Tr. 29. He also washes dishes and does the laundry, although most of the time someone else does his laundry for him. Tr. 29. He requires help shaving and doing his hair. Tr. 29. He has no hobbies and he does not watch television. Tr. 30. He stated that he spends his time "figuring out what else to do with like—getting my eye surgery or try to get some kind of help." Tr. 30. He applies for jobs "but most of the time nothing happens." Tr. 30.

Bailey testified that he never worked because he has "terrible" vision. Tr. 32. He also stated that he has a problem with authority figures and anger problems. Tr. 32. He is not in counseling. Tr. 33. He used to go to counseling but he "never got any benefit out of it because they always tell me the same thing." Tr. 33. He also went to "other places" but "nothing []ever helped." Tr. 33. He stated that he did not believe that people understood what he was trying to tell them and so he stopped talking. Tr. 33.

Bailey stated that he is not on any medication. Tr. 33. He stopped taking his medication in the beginning of 2013 because "every time I take my medication, it don't do nothing but make

it worse." Tr. 34. He explained that the medication suppresses everything and just makes him sleep. Tr. 34. Also, "everything that builds up from the time that I take it to the time that it comes off, I don't think that would work too good because a lot of bad stuff happen when that happen." Tr. 34. When the ALJ asked Bailey how he expects to get better if he is not in counseling and not on medication, Bailey responded, "I'm just trying to find somewhere else to go, maybe some other things I can do." Tr. 34. He elaborated: "I just get my mind off it, just stuff I can't control. And other counseling and places that I can go to because the places that I've been to, they really haven't helped." Tr. 34. The last place he sought help from was Laurelwood in July 2012. Tr. 35. He went for anger management classes that were required by probation. Tr. 35. He has not tried anywhere else since that time, which was more than one year prior to the hearing. Tr. 36. Bailey also stated that he does not know where to go "for free that would help me more than somewhere I would go and I'd have to pay." Tr. 35. The ALJ asked Bailey if he had been rated at Metro and Bailey replied, "not yet." Tr. 35. Bailey tried the free clinic but the clinic, "like a lot of places," has a waiting process and "sometimes I just go off when I shouldn't." Tr. 35.

With respect to his diabetes, Bailey testified that he cannot afford his medication and that sometimes he takes his mother's diabetes medication. Tr. 36. He said he has been rated at the Cleveland Clinic and met with a social worker there, but he still cannot afford the medication. Tr. 36-38. He contacted the diabetes association but "they didn't give me anything." Tr. 38. He is scheduled for another surgery on his left eye and he is trying to get his diabetes under control before then. Tr. 37. He cannot afford to take insulin every day so he only takes it when it gets really bad. Tr. 38. He monitors his sugar but it is not "real, real bad." Tr. 38. He has

8

succeeded in losing some weight by eating healthier foods. Tr. 38-39. Bailey testified that at the time of the hearing he weighed 348 pounds and is 5'11" tall. Tr. 38.

Bailey stated that he does not like being around a lot of people because it makes him feel paranoid, "like somebody is talking about me for some reason." Tr. 40. He stated that he does not have a problem with memory and that, "if anything I remember too much, I feel that that may be a problem for me." Tr. 40. He used to like to draw but no longer does so because he gets frustrated because he "can't see half the stuff that I'm drawing." Tr. 40. His good eye, the right, has "good vision but is blurry." Tr. 40. For now, his right eye is not a major concern but his doctor told him he may have to have surgery on his right eye at a later time. Tr. 41. He cannot wear glasses because there is not a strong enough lens for either the left or the right eye. Tr. 41.

### 2. Vocational Expert's Testimony

Vocational Expert Robert Mosley ("VE") testified at the hearing. Tr. 41-45. The ALJ asked the VE to determine whether a hypothetical individual of Bailey's age and education could perform any work in the regional or national economy if that person can perform a full range of medium work and has the following characteristics: is unable to climb ladders, ropes, or scaffolds; must avoid exposure to hazardous positions, particularly unprotected heights and moving machinery; cannot drive commercially; cannot read small print or from far away due to limited near and far acuity in the left eye; and cannot use depth perception. Tr. 42-43. The VE testified that such a person could perform work as a cleaner (2,000 regional jobs, 7,000 Ohio jobs, 300,000 national jobs), kitchen helper (3,500 regional jobs, 20,000 Ohio jobs, 500,000 national jobs), and bagger (1,200 regional jobs, 5,000 Ohio jobs, 200,000 national jobs). Tr. 43-44.

The ALJ asked the VE whether an additional limitation—that the same hypothetical individual described above would be required to work in an environment where they were mostly working by themselves—would impact the individual's ability to perform the jobs previously mentioned.  Tr. 44.  The VE answered that the ability to perform the jobs previously mentioned would not be impacted because the worker would not be working in tangent with anyone else.  Tr. 44.  Next, the ALJ asked the VE whether the first hypothetical individual described could perform the previously mentioned jobs if the individual was required to perform simple routine tasks with simple short instructions, make simple decisions, and have fewer place changes with occasional and superficial interaction with coworkers, supervisors, and the public.  Tr. 44.  The VE stated that such an individual could perform the jobs previously mentioned.  Tr. 44.  Finally, the ALJ asked the VE whether the following characteristic would impact the hypothetical individual's ability to perform the jobs previously mentioned: the individual would have difficulty maintaining a regular work schedule such that, at least three times per month, the individual would be absent or tardy or have to leave early from work.  Tr. 45.  The VE answered that, based on his own work experience and training, such a limitation would impact the individual's ability to perform all the jobs previously mentioned because the individual would not be able to maintain or retain employment. Tr. 45.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

10

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her January 10, 2014, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since November 16, 2012, the application date.  Tr. 11.

2. The claimant has the following severe impairments: bi-polar disorder in partial remission, intermittent explosive disorder, diabetes mellitus and blind in the left eye.  Tr. 11.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 11.

4. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except: the claimant should not climb ladders, ropes or scaffolds; he should not be exposed to hazardous conditions which include unprotected heights, moving machinery, and commercial driving; he has limited near and far acuity in the left eye so that he should not be required to read small print or read from far away and has no use of depth perception.  He can perform simple routine tasks with simple, short instructions, make simple decisions, have few workplace changes, and only occasional and superficial interaction with coworkers, supervisors and the public.  Tr. 13.

5. The claimant has no past relevant work.  Tr. 16.

6. The claimant was born on August 9, 1991 and was 21 years old, which is defined as a younger individual age 18-44, on the date the application was filed.  Tr. 16.

7. The claimant has at least a high school education and is able to communicate in English.  Tr. 16.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 16.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 16.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 16, 2012, the date the application was filed. Tr. 17.

### V. Parties' Arguments

Bailey objects to the ALJ's decision on three grounds. He argues that substantial evidence does not support the ALJ's credibility determination, her finding that Bailey can perform unskilled work, her Residual Functional Capacity (RFC) assessment, and her hypothetical question posed to the VE. Doc. 12, p. 1. In response, the Commissioner submits that substantial evidence supports the ALJ's credibility determination, unskilled work finding, RFC assessment, and hypothetical question posed to the VE. Doc. 13, p. 8.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

#### A. Substantial evidence supports the ALJ's credibility determination

Bailey argues that the ALJ's credibility determination is not supported by substantial evidence. Doc. 12, p. 10. He asserts that, when assessing Bailey's credibility, the ALJ

improperly attached significance to the following: that Bailey did not attempt to seek help from any community or pharmaceutical programs and that he has a tendency to stop taking his medication.  Doc. 12, p. 10.  Bailey also contends that consultative examiner Dr. Wax's opinion that he was malingering is not justified and, as a result, the ALJ's reliance on Dr. Wax's opinion that Bailey was malingering as part of her credibility finding "was contrary to law."  Doc. 12, p. 11.

An ALJ may consider a claimant's failure to seek treatment in assessing the claimant's credibility.  *Blacha v. Sec'y of HHS*, 927 F.2d 228, 231 (6th Cir. 1990).  The claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."  SSR 96-7p, 1996 WL 374186, at *7.  An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record," that may explain the claimant's failure to seek treatment.  *Id*.

Here, the ALJ complied with SSR 96-7p because she considered Bailey's explanations before she drew any inferences about his lack of treatment.  *See id*.  At the hearing, the ALJ extensively questioned Bailey about his pursuit of treatment and medication.  Tr. 33-38.  Bailey testified that he has trouble affording medication for his diabetes.  Tr. 36.  The ALJ asked Bailey whether he had met with a social worker at the Cleveland Clinic and Bailey answered that he had, but that the available coverage would not extend to diabetes medication.  Tr. 37-38.  The ALJ asked whether the social worker provided Bailey with other programs he could apply to.  Tr. 38.  Bailey answered that the social worker suggested the diabetes association and that he called

them, but "they didn't give me anything." Tr. 38. The ALJ commented that there is no evidence in the record that Bailey sought help from community or pharmaceutical programs. Tr. 14. *See* SSR 96-7p,1996 WL 374186, at *7 (the ALJ may consider the claimant's explanations *or other information in the case record*) (emphasis supplied).

Additionally, with respect to treatment for his mental symptoms, Bailey testified that he stopped taking his medication because it did not help him, not because he could not afford it. Tr. 33-34. However, the ALJ referenced a treatment record indicating that Bailey's mental symptoms had improved with medication. Tr. 14, 171. Bailey also testified that he did not go to counseling because it did not help him. Tr. 33. When the ALJ asked Bailey how he expects to get better without medication or counseling, Bailey mentioned "other counseling and places I can go to" but admitted that he had not sought out any such place. Tr. 34-35. His last counseling session was over one year prior to the hearing and he was required to attend it as part of his probation. Tr. 35.

In his brief, Bailey asserts that he testified at the hearing that he tried to go the free clinic "but they kept putting him off." Doc. 12. However, a review of the transcript indicates that Bailey did not testify that the free clinic "put him off"—he testified that there is a waiting process and admitted, "sometimes I just go off when I shouldn't." Tr. 35. And, although Bailey testified that he had been rated at the Cleveland Clinic to no avail, he admitted that he had "not yet" been rated at Metro. Tr. 35. Thus, the ALJ complied with SSR 96-7p when she considered Bailey's failure to seek treatment and his explanations as part of her credibility assessment.

Lastly, Bailey argues that there are "inconsistencies" in Dr. Wax's opinion that led Dr. Wax to conclude that Bailey was malingering and that the ALJ was not justified in relying on Dr. Wax's opinion. Doc. 12, p. 11. Bailey asserts the following inconsistencies: Dr. Wax found it

suspicious that Bailey did not know how much his girlfriend (whom he lived with at the time) paid in rent; Dr. Wax found it suspicious that Bailey could use a cell phone app but said he could not use a microwave because he could not see well enough; and Dr. Wax relied on Bailey's ability to care for his girlfriend's one-year-old child despite the fact that Dr. Wax's narrative did not report that Bailey ever cared for the child. Doc. 12, p. 11.

The undersigned finds that any "inconsistencies" in Dr. Wax's opinion were merely reflective of Bailey's inconsistent statements during the consultative exam, as the ALJ indicated. Tr. 14, 15. For example, Bailey does not dispute that, as the ALJ and Dr. Wax pointed out, he could use a cell phone app and was able to fill out examination forms without difficulty, yet he claimed that he could not use a microwave because he could not see well enough to do so. Tr. 14, 245. The fact that Dr. Wax's narrative does not state that Bailey cared for his girlfriend's one-year-old does not discredit Dr. Wax's finding that, based in part on this fact, Bailey retained certain mental abilities. Notably, Bailey does not allege that he did not care for his girlfriend's child or that he never told Dr. Wax that he cared for the child. And, although Bailey is correct in arguing that there may be reasons why he would not know the amount of rent his girlfriend was paying, Dr. Wax's opinion that this was suspicious is not sufficient grounds for reversing the ALJ's decision. Finally, the ALJ explained that Bailey's vagueness about his daily activities and his inconsistent statements supported Dr. Wax's conclusion that he was malingering. Tr. 14. Bailey's disagreement with Dr. Wax's opinion does not render Dr. Wax's opinion faulty.

In sum, the undersigned finds that substantial evidence supports the ALJ's credibility determination and it should be upheld. *See Garner*, 745 F.2d at 387 (the court does not decide questions of credibility); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476-477 (6th Cir. 2003)

(the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

### B. Substantial evidence supports the ALJ's finding that Bailey can perform unskilled work

Bailey argues that the record supports a finding that he is mentally unable to perform unskilled work.  Doc. 12, p. 12.  He argues that Dr. Wax's conclusion—that he would have difficulty responding appropriately to supervisors, coworkers, and work pressures in a work setting—equates to a "substantial loss" of ability to meet basic work-related functions as set forth in SSR 85-15.  Doc. 12, p. 12.  Bailey's argument fails.

Dr. Wax did not opine that Bailey was unable to perform all unskilled work.  He found that Bailey had significant limitations in the aforementioned areas.  Tr. 248.  Additionally, in making her RFC assessment, the ALJ gave significant weight to the opinions of the state agency reviewers, Drs. Goldsmith and Katz.  Tr. 15.  The ALJ commented that Drs. Goldsmith and Katz found that Bailey had moderate difficulties in social functioning and concentration, persistence and pace and had the ability to perform simple tasks and make simple decisions with occasional interpersonal contacts.  Tr. 15.  The ALJ accounted for these limitations in her RFC assessment and Bailey has not explained how the restrictions in the RFC fail to accurately reflect these limitations.  Tr. 13.  As the ALJ also observed, "[Bailey] has not provided any support for his allegations that he cannot be around people and that he is totally unable to see to work."  Tr. 15. Accordingly, the undersigned finds that the ALJ's decision is supported by substantial evidence and should be upheld.  See Jones, 336 F.3d at 477.

### C. Substantial evidence supports the ALJ's RFC assessment and her hypothetical posed to the VE

Bailey argues that the ALJ's RFC assessment and resultant hypothetical posed to the VE were unsupported because they were based on an incomplete credibility analysis. Doc. 12, p. 13. The undersigned has considered and rejected Bailey's credibility argument, *supra*. As for Bailey's contention that the hypothetical posed to the VE failed to provide for limitations in maintaining a regular work schedule, Bailey does not identify evidence in the record indicating that he had limitations maintaining a regular work schedule. *See Casey v. Sec'y of Health and Human Servs*., 987 F.2d 1230, 1235 (6th Cir. 1993) (an ALJ's hypothetical question to the VE "is required to incorporate only those limitations accepted as credible by the finder of fact."). The ALJ's hypothetical to the VE incorporated limitations she accepted as credible. Bailey's argument is, therefore, without merit.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

Dated: April 7, 2015

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).